**UNITED STATES of America**

v.

**Jason R. HERRON, Appellant.**

**No. 76–1496.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 17, 1977.

Decided Aug. 1, 1977.

Rehearing Denied Sept. 19, 1977.

---

. Gary G. Quintiere and Thomas D. Johnston, Washington, D. C. (both appointed by this court) for appellant.

Jeffrey Blumenfeld, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Before BAZELON, Chief Judge, and McGOWAN and MacKINNON, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

Opinion filed by Chief Judge BAZELON, concurring in the result.

MacKINNON, Circuit Judge:

Appellant, Jason R. Herron, was found guilty of possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a) (1970); possession of marijuana in violation of D.C. Code § 33–402 (1973); and possession of phencyclidine in violation of D.C. Code § 33–702 (1973). His appeal raises four issues. We affirm the judgment of conviction on all counts.

I

Agents of the Drug Enforcement Administration (DEA), conducting a surveillance of apartment 203, 3410 A Street, S.E., in the District of Columbia (Tr. 81, 85–86), observed appellant and one Theodore Watson in and around the building engaged in various activities. Each of the men was seen driving a car registered to the other, and Herron was observed going into and out of the building (Tr. 82–83, 86–91; Supp. Tr. 4, 6).[1] During this period Ethel Vanessa Smith also purchased narcotics in that apartment, and the DEA agents obtained a warrant to conduct a search of the premises.

At about 7:30 P.M. on March 12, 1974, as the DEA agents were approaching apartment 203 to execute the search warrant, two women knocked on the door. As the door began to open from the inside the agents started quickly towards it. Upon noticing the approach of the agents, one of the women yelled "Jason," and the door was then slammed shut from the inside (Tr. 7–8, 31–32). The women ran and escaped. The agents announced their intention to execute the search warrant, but there was no response from inside the apartment. When the agents broke down the door and entered, they found Herron alone in the apartment standing in the doorway to the kitchen, holding a German shepherd dog on a leash (Tr. 9–10, 16–17, 51, 83–84).

---

1. "Supp. Tr." references are to the separately paginated transcript of the trial testimony of Special Agent West and Ethel Vanessa Smith.

The agents also found, on top of a table in neat rows, thirteen tinfoil packets of heroin and $150 to $200 in cash (Tr. 13–15, 36, 52–53, 57). A more complete search of the apartment revealed a total of 53.5 grams of heroin of purity varying from 5 to 12% (Tr. 3–5, 34, 40–41, 60–62, 117–18) with a street value of approximately $38,000. In the bedroom they found more than $16,000 in cash beneath a dresser, and in the kitchen a vial containing marijuana on top of the refrigerator. They also discovered various paraphernalia commonly used in the cutting or diluting of heroin down to street level strength, including bottles of lactose, a tray, strainers, measuring spoons, and pieces of tinfoil, some of which bore traces of heroin (Tr. 14, 17–20, 22, 63–65).

When one of the agents stated that he intended to search a locked bedroom closet, appellant Herron responded "I have a key, I don't want you breaking up *my stuff*," and unlocked the door (Tr. 85, emphasis added). As agents searched another closet in the living-dining area, appellant said, "don't wrinkle my clothes" (Supp. Tr. 3–4, 9). When an agent asked Herron what he was doing at the apartment he replied that "he lived there" (Tr. 85). It was stipulated that the drugs recovered were heroin, marijuana and phencyclidine, and that papers recovered in the apartment bore the names of both Herron and Theodore Watson. These papers included a receipt for clothing in the name of Herron and Watson, a rent receipt in Watson's name, and two telephone bills in Watson's name.

For the defense, Regina Howard testified that she went to apartment 203 on March 12, 1975, to visit a friend, Caroline Rice, who lived there with her husband Larry (Tr. 130–31, 134). She also testified that Caroline Rice had stayed, and still stays at times, at her mother's apartment on Ridge Road in Southeast Washington (Tr. 136). Caroline Rice testified that she and her husband had rented the apartment from Theodore Watson and lived in it with their child from November, 1974, to April, 1975 (Tr. 138). In other words, Caroline Rice testified that she and her family were living in the apartment at the times material to the charges against Herron.

The DEA agents had previously testified that on the day of the raid they observed only men's clothing in the apartment, no women's or children's clothing (Tr. 43, 67, 95). On cross-examination Caroline Rice admitted that she did not return to the apartment until three days after the search and testified further that in the interim she and her husband had lived at her mother's house, where they stayed quite often (Tr. 142–43).

Appellant testified in his own behalf that on the evening of March 12, he went to apartment 203 to visit his friend Larry Rice (Tr. 157). When he arrived Rice was preparing to leave to pick up his wife and he asked Herron to stay, saying that he would soon return (Tr. 159). Appellant also testified that he had known Theodore Watson since high school and had once been in that apartment with Watson but he had never seen any of the drugs introduced at trial (Tr. 163–67). He specifically denied living in apartment 203 and also denied having seen or sold narcotics to Ethel Vanessa Smith at that apartment (Tr. 180, 191).

In rebuttal the Government offered the testimony of Ethel Vanessa Smith, who testified pursuant to an agreement with the Government to drop the charges against her in return for her testimony (Supp. Tr. 15–16). She testified she was introduced to Herron by Caroline Rice who took her and a man named Trapp to buy some heroin from Herron in apartment 203. Trapp gave Mrs. Rice $125 for a spoon of heroin and Mrs. Rice and Miss Smith then went to the apartment where Miss Smith gave appellant Herron the $125 and received from him in return a package of heroin. At the time Herron was dressed only in a robe and slippers and was there alone except for a German shepherd dog (Supp. Tr. 17–18). Herron gave her the heroin from a pile of aluminum foil packages which were in view on the table in the dining room (Supp. Tr. 18).

Miss Smith returned approximately three times after the first purchase and on each

occasion she purchased a $25 bag of heroin from appellant (Supp. Tr. 18–19). Miss Smith further testified that only Theodore Watson and Herron were living in the apartment, and that when she and Mrs. Rice had first gone to the apartment, Mrs. Rice was not living at the apartment but "off Ridge Road, Southeast," where she and Trapp and a man named Gerald Brown picked up Mrs. Rice on their way to appellant's apartment (Supp. Tr. 19–20).

Appellant's claim that the Rices lived in the apartment was further refuted by Miss Smith's testimony about a conversation she heard while riding to the office of Watson's lawyer, in a car with Herron, Rice and Watson. She testified that the three talked about Rice being paid for "taking the charge" for Watson (Supp. Tr. 20–21, 25), and that Watson told Rice what to say when he got down to the lawyer's office (Supp. Tr. 20–21). Later in April Miss Smith was present at another conversation between Watson and Rice in which Watson told Rice he would pay him to move into apartment 203 along with his wife (Supp. Tr. 25–28). Herron was not present during this second conversation and it was admitted into evidence only for its bearing on the credibility of Caroline Rice (Supp. Tr. 26–27). On cross examination Miss Smith stated that she had purchased narcotics from Watson several times at the same apartment, and once from Herron (Supp. Tr. 35–37). One of the DEA agents also testified that during the search they had found on the floor a .38 caliber revolver loaded with five live rounds of ammunition (Tr. 213–16).

## II

■ Appellant contended at trial (Tr. 124–28), and here repeats the contention, that the evidence in the Government's case in chief did not sufficiently prove Herron's constructive possession of drugs and that, therefore, his motion for judgment of acquittal should have been granted.

The relevant evidence at that stage of the trial indicated that the apartment, if not solely Herron's, was at least as much his home as anyone else's. *He was alone in the apartment* at the time of the search, dressed in a robe and slippers. The women who knocked on the door called out Herron's first name in warning as the agents rushed the door. He had control of the dog. He claimed the clothing in two closets as his, and furnished the keys which he correctly said would open one of the closets. Herron stated that he lived in the apartment. The agents had seen appellant enter and leave the apartment several times in the short period they had it under surveillance and saw Herron driving Watson's cars and Watson driving Herron's cars. The acts of the women at the time the agents broke into the apartment indicate that they expected Herron to be behind the closed door, and this is probative of the regularity with which appellant occupied the place and his special relationship to the apartment and to its lessee, Watson. Such evidence was sufficient for the jury to conclude that Herron was not a temporary occupant of the apartment and that his special relationship to it was of a permanent character sufficient to indicate a possessive interest in its contents. *Cf. United States v. Holland,* 144 U.S.App.D.C. 225, 227, 445 F.2d 701, 703 (1971). Thirteen packets of heroin were in plain view on the kitchen table. The marijuana was out in the open on top of the refrigerator, and the other drugs were in areas to which he had access. The narcotics cutting paraphernalia found in the apartment and the large quantity of drugs found was supportive of an intent to distribute, as was the heroin that was packaged in a convenient manner as if for sale. *See United States v. James,* 161 U.S.App.D.C. 88, 112, 494 F.2d 1007, 1031, *cert. denied,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). The $150 to $200 in cash that was on the table *next* to the heroin packaged in folded tinfoil slips was also some evidence of distribution, and the $16,000 in cash that was discovered elsewhere in the apartment, in view of the well-known highly lucrative character of narcotics distribution, was also probative of that element. Herron was in *sole* possession at the time.

When a reasonable mind might fairly have a reasonable doubt of guilt or might fairly have none, the decision is for the jurors to make. *Curley v. United States,* 81 U.S.App.D.C. 389, 392–93, 160 F.2d 229–232–33, *cert. denied,* 331 U.S. 869, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). We conclude that on these facts the district court properly denied appellant's motion for a judgment of acquittal.

When all the testimony was in, more convincing evidence of Herron's intent to distribute the drugs had been furnished by Miss Smith's testimony that she had actually purchased heroin from him on several occasions (Supp. Tr. 17–19). The first purchase was for $125 and the three subsequent purchases were for $25 each (*id.*). She knew Herron and identified him (Supp. Tr. 15), and also testified that Herron, and not the Rices, lived in the apartment. This corroborated the agent's testimony which quoted Herron's statement to that effect. We thus also find that there existed sufficient evidence to affirm the judgment of conviction.

### III

Appellant next contends that the district court, in its instructions to the jury, gave an improper illustration of the term "reasonable doubt" (Tr. 237–38).

We held in *United States v. Pinkney,* 179 U.S.App.D.C. 282, 551 F.2d 1241 (1976), that an instruction on reasonable doubt, *inter alia,* which involved an explanation substantially identical to that given here by the same judge, constituted plain error. But that decision was reached in part because of the character and relative weakness of the Government's case. The evidence in this case, however, is more extensive and a great deal stronger than in *Pinkney.* There is no doubt whatsoever that Herron was the only person in the apartment, that some drugs were in the open and packaged as if for sale, and that the heroin that was hidden had the very substantial value of $38,000. Defense counsel made no objection to the "reasonable doubt" illustration, and stated after the conclusion of the court's jury charge, that he was "satisfied as a whole" with the instructions and that he did not have "[a]ny requests for further instructions" (Tr. 243). We thus conclude that the charge did not constitute reversible error because the instruction as given was harmless beyond a reasonable doubt. *Cf. United States v. Byrd,* 494 F.2d 1275 (8th Cir. 1974); *United States v. Moore,* 140 U.S.App.D.C. 309, 310 n. 1, 435 F.2d 113, 114 n. 1, *cert. denied,* 402 U.S. 906, 91 S.Ct. 1376, 28 L.Ed.2d 647 (1970); *United States v. Baratta,* 397 F.2d 215 (2d Cir.), *cert. denied,* 393 U.S. 939, 89 S.Ct. 293, 21 L.Ed.2d 276 (1968).

### IV

Herron also contends that the trial court committed plain error in failing to give an "informer's" instruction with respect to the testimony of Miss Smith. Appellant's Br. at 27–32.[2] We dispose of this contention principally by noting that such an instruction was not requested as required by Fed.R.Crim.P. 30.[3] Instead, coun-

---

2. Appellant contends that a proper instruction would have been:

   The testimony of an informer who provides evidence against a defendant for pay, *or for immunity from punishment, or for personal advantage* or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether the informer's testimony has been affected by interest, or by prejudice against the defendant. C. Blackmar & E. Devitt, Federal Jury Practice and Instructions, § 12.02 (2d ed. 1970). *See also* Mathes, Jury Instructions and Forms for Federal Criminal Cases, § 3.02, 27 F.R.D. 39, 68 (1960). (Emphasis added.)

   Appellant's Br. at 29–30.

3. Fed.R.Crim.P. 30 provides:

   At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time copies of such requests shall be furnished to adverse parties. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. *No party may assign as error any portion of the charge or omission therefrom unless he objects*

sel expressed his satisfaction with the instructions given by the court (Tr. 218, 222, 243). Appellant's brief admits that in those cases where courts have found the failure to give an informer's instruction to be plain error

the dispositive fact was that the testimony of the tainted witness—the accomplice [or] the informer—constituted all or virtually all of the Government's case against the defendant. [*Cf.*] *McMillen v. United States,* 386 F.2d 29[, 36] (1st Cir. 1967)[, *cert. denied,* 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968)]; *Tillery v. United States,* 411 F.2d 644[, 646] (5th Cir. 1969); *Williamson v. United States,* 332 F.2d 123[, 132] (5th Cir. 1964); *United States v. Griffin,* 382 F.2d 823[, 828–29] (6th Cir. 1967); *United States v. Owens,* 460 F.2d 268[, 269] (10th Cir. 1972).

Appellant's Br. at 31–32. We agree, and because of the inherent strength of the Government's case, we find that plain error was not committed.

When the court failed to give the instruction of its own volition, Miss Smith's testimony did not stand alone. A prima facie case had been made without Miss Smith's testimony. In its principal features the agents' testimony corroborated Miss Smith's testimony as to the relationship between Herron and Watson, *i. e.,* that Herron lived in the apartment and had ready access to everything in it. They also had received the heroin she had purchased. The court's charge on credibility had included the admonition that the jurors "may con-

sider and should consider [*inter alia*] . . . whether the witness has an interest in the outcome of the case" (Tr. 239). Her exact interest had been openly displayed to the jury by her own testimony (Supp. Tr. 16).[4] Had trial counsel considered that an additional instruction was necessary there is no indication it would not have been given. Defendants should not be permitted to lull courts into a false sense of security as to the position of counsel on a particular instruction and thereby profit by their own failure to comply with one of the most basic rules of trial procedure.

## V

■ Next, appellant contends that because Miss Smith's testimony was not introduced until rebuttal, the court should have given an instruction limiting its use by the jury to impeachment. The contention has two deficiencies. First, a limiting instruction was not requested.[5] Second, the testimony given by Miss Smith was primarily substantive evidence, properly admissible in rebuttal as such, even though it did have some probative quality as impeachment. The evidence in question was not offered *solely* for its effect as impeachment and is not required to be so limited.

■ When testimony is offered or admissible solely for impeachment purposes, a limiting instruction may be required because the evidence does not have, and cannot be given, any substantive effect. But when testimony is probative of the commis-

---

thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.
(Emphasis added.)

4. Miss Smith, when she first took the stand, testified:

Q Was there any agreement between you and the United States Government in response to their request that you testify at trial?
A Yes, there was.
Q Would you tell us what the basis of that agreement was?

A That my charge would be dropped if I testify.
Q Are you presently charged with crimes?
A Yes, I am.
Q What kind of crimes are they?
A Heroin charges.
Supp. Tr. 16.

5. We are not unmindful of our decisions in *United States v. Henson,* 159 U.S.App.D.C. 32, 486 F.2d 1292 (1973) (en banc); *United States v. Fench,* 152 U.S.App.D.C. 325, 470 F.2d 1234 (1972), *cert. denied,* 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973); *United States v. Thomas,* 148 U.S.App.D.C. 148, 459 F.2d 1172 (1972); *United States v. Bobbitt,* 146 U.S.App.D.C. 224, 450 F.2d 685 (1971); *United States v. McClain,* 142 U.S.App.D.C. 213, 440 F.2d 241 (1971).

sion of the offense by the accused, and is properly admitted for that substantive purpose, there is no need for an instruction cautioning against such inferences. The rebuttal testimony of Miss Smith contradicted the testimony of Herron and of the defense witnesses to the effect that Herron did not live in apartment 203 at the time it was raided and that he did not know that narcotics were in the apartment (Tr. 166–67). This was substantive evidence that was directly probative of the commission of the crime charged and constituted proper rebuttal testimony.

Appellant further contends, however, that in order for such evidence to have any probative effect as substantive evidence it had to be admitted in the Government's case in chief, i. e., that when it was offered in rebuttal it was thereby limited to its impeaching effect. We disagree. When the defense offered testimony which it contends proved that Herron did not commit the offenses with which he was charged, it opened the door to the introduction of rebuttal testimony of a substantive character. Such testimony was given by Miss Smith.

But appellant is not the only one confused as to this aspect of the trial. The Government is equally confused in its contention that the testimony of Miss Smith *should* have been kept out of its case in chief. In asserting this proposition the Government relies upon a statement of this court in *United States v. Jones,* 155 U.S. App.D.C. 88, 476 F.2d 533 (1973). The indictment in that case charged a sale of narcotics on a particular date. At trial, in its case in chief, the Government introduced evidence of the sale charged in the indictment and also introduced testimony of a sale eleven days earlier which was made by the same defendant under similar circumstances but which was not charged in the indictment. The testimony as to the earlier sale was admitted because of its relevance to prove identity and common scheme and plan. The defendant subsequently took the stand and denied being involved in either sale and denied any relationship with any narcotics traffic. In our opinion discussing the issue of the admissibility of the evidence of the earlier sale as a part of the Government's case in chief, we stated:

> The problem is sufficient, however, for us to note that the prosecution would be wise to preserve such evidence for rebuttal, after the defense case has been sharpened and the judge may therefore more accurately consider the degree of relevancy and the potential for abuse. *See United States v. Crawford,* 438 F.2d 441, 448 (8th Cir. 1971) and *United States v. Adams,* 385 F.2d 548, 551 (2d Cir. 1967).

155 U.S.App.D.C. at 92, 476 F.2d at 537. This quotation is here cited as justification for the prosecutor's decision to withhold offering the testimony of Ethel Vanessa Smith until rebuttal (Govt. Br. at 25). There is no question but that *Jones* does lend itself to that interpretation and because it does we take this opportunity to replace it with our own dictum, or advice to prosecutors, so that prosecutors hereafter may not be misled.

The circumstances in *Jones* were peculiar because the earlier narcotics transaction was really a separate offense for which the appellant had originally been indicted. The charge, however, had been dropped because of the U.S. Attorney's failure to notify the defendant of a reindictment of the offense which alleged a date one day earlier than charged in the original indictment. In *Jones* there may have been some assurance that the defense would introduce evidence that would ensure the admissibility of the evidence in question, but if that were not the case we question the wisdom of the observation that the introduction of the evidence of the earlier sale should be deferred until rebuttal, and most certainly we question its wisdom here and as a general rule.

In our opinion the best rule for the prosecutor in a criminal case is that he should in the Government's case in chief introduce *all* the evidence of the defendant's guilt that is properly admissible in that stage of the trial. In most criminal trials there is no assurance that a defendant will take the stand or put in any evidence. Its case in chief may well be the only oppor-

tunity the prosecution will have to introduce the evidence. To lay in the weeds with some critical or clinching testimony many times proves to be disastrous because the defense puts in no testimony, or the testimony it does introduce does not permit the introduction of the reserved testimony as proper rebuttal. We all know there may be situations where a case is dramatically won by holding back some important evidence, but it is our observation that more cases are hazarded or lost by adopting such tactics. If questions of relevance, admissibility, etc., arise, such as were here present, the Government at a bench conference can always offer to wait until rebuttal, if it is assured there will be rebuttal. But to rest without introducing vital evidence in the expectation of a second opportunity arising is in our opinion generally most unwise. There are just too many cases where the Government never gets that second chance.[6]

## VI

There still remains one matter to explore and discuss. In his reply brief, for the first time, appellant makes a new attack on Miss Smith's testimony:

> Finally, the appellant's concern as to the inherently suspect character of Ms. Smith's testimony is borne out by a subsequent event which has recently come to appellant's attention. Less than four months after testifying in the appellant's trial, Ms. Smith appeared as a witness for Theodore Watson in a hearing held to determine whether Mr. Watson should be released on bail pending his appeal. Ms. Smith admitted during the hearing that she had previously lied to Mr. Watson's

attorney in exchange for $500 paid to her by Mr. Watson. She said that she had been persuaded by Watson to state falsely to the attorney that it was Herron, not Watson, who sold her drugs on the four occasions for which Watson had been charged. She testified at the hearing, however, that she purchased the drugs from Watson. This proves unquestionably that Ms. Smith was a person who would lie if the price were right, and thus suggests all the more forcibly that a special cautionary instruction was required in this case.

Reply Br. at 15–16 (footnote omitted). We have carefully examined this allegation and the cited references. The situation to which it refers resulted from a continuous attempt by Theodore Watson to importune Miss Smith to recant her testimony at his trial. Watson had been charged with a number of counts, including four counts of distribution of heroin in violation of 21 U.S.C. § 841(a) (1970).[7] The distribution counts were based on four buys made by Miss Smith on behalf of the DEA agents; she had in each instance told the agents that she had made the purchase from Watson. These four purchases were distinct from the purchases to which she testified at Herron's trial (Supp. Tr. 17–19).[8] According to Miss Smith's testimony at a hearing on Watson's motion for release pending appeal, Watson had sought by various means, after Herron's trial, to induce her to change her testimony and name Herron as the seller of the drugs she had purchased for the agents, but she had been reluctant to comply. Watson showed her a written transcript of her testimony at the Herron trial,

---

**6.** We do not mean to imply, however, that there is anything improper about the Government adopting that tactic.

**7.** The distribution counts against Theodore R. Watson in Criminal No. 75–650, as filed September 23, 1975, charged that he and Ethel V. Smith unlawfully distributed heroin as follows:

First Count:    995.6 milligrams on March  4, 1975
Second Count: 12,370 milligrams on March  4, 1975
Third Count:   6,547 milligrams on March 11, 1975
Fourth Count:  3,205 milligrams on March 12, 1975

The Fifth Count charged Watson with unlawful possession with intent to distribute 53,708 milligrams on March 12, 1975. The remaining five counts were all against Watson only and charged simple possession of heroin, marihuana and phencyclidine and possession of two firearms after a felony conviction.

**8.** On cross-examination, Miss Smith showed some confusion over the number of purchases from Herron, but insisted that she had bought from him (Supp. Tr. 36–37).

asked her to testify just the same except to change his name to Herron (Watson H. Tr. 26),[9] and offered to pay her if she did so. She said she might do it (*id.* at 28), but added she did not want to "go to any courts" (*id.* at 25). Watson later brought his lawyer into the discussions and he purported to advise her on some of the legal aspects of the situation. Miss Smith testified that before she went to the attorney's office, Watson gave her $500 "[f]or going down to the lawyer's office with him, and if I signed a statement" (*id.* at 39). He also told her that he would give her another $500 "[i]f they withdraw his plea" (*id.* at 40). She then went to the office of Watson's counsel "to tell him I got the drugs from Jason Herron instead of Mr. Watson" (*id.* at 42). The lawyer told her that she "could use the [written] statement if Theodore Watson's name wasn't in my testimony . . . in Jason Herron's trial, we probably could use the statement" (*id.* at 31). Watson told her that *his counsel had "worked out a way [that she] might not have to go to court,"* and counsel told her the same thing. She did not want to go to court because she did not want to commit perjury (*id.* at 46), and she told counsel she would not commit perjury (*id.* at 47). Before the hearing she told the prosecutor about having been paid $500 by Watson (*id.* at 56), and at the hearing she testified that "the truth is I got [the heroin] from Mr. Watson" and that it would be perjury if she testified to obtaining the heroin from Herron on the four occasions referred to in the four distribution counts against Watson (*id.* at 47). She further testified that *she had told Watson's counsel* that she had obtained

the drugs from Herron because Watson had told her to say so (*id.* at 45).

It thus does not appear on the record that Miss Smith has committed any perjury in either Herron's case or Watson's. In fact, she has stood up against very strong inducements to change her testimony. It was wrong and very unwise for her to accept the $500 from Watson and to lie to Watson's counsel, but it must be recognized that in the face of very strong pressures she has at all times *in court* adhered to the same story. She also indicated to Watson and his counsel that she would not commit perjury.[10] Herron has not introduced any proof that Miss Smith committed perjury in his trial or thereafter, and we see nothing in her subsequent conduct that affects Herron's conviction. If the Government had acquired evidence that she had committed perjury it would have been obligated to present such facts to the court that tried Herron.

*Affirmed.*

BAZELON, Chief Judge, concurring in the result:

This case raises the troubling question of how much evidence is sufficient to establish a prima facie case of constructive possession when illicit drugs are found in a common area of a residence shared by two or more people. Although I find that this Court's decision in *United States v. Davis,* 183 U.S. App.D.C. 162, 562 F.2d 681 (1977), forces us to affirm Herron's conviction,[1] I believe the question warrants further discussion.

9. "Watson H. Tr." references are to the transcript of the May 6, 1976 hearing on Watson's motion for release pending appeal.

10. While we cannot accurately pass on the conduct of Watson's trial counsel on this one-sided record (counsel has not testified), the testimony does raise questions about the extent of his involvement. On this record we are unwilling to make any further comment.

1. In *Davis* the appellant was convicted along with his two roommates of (1) simple posses-

sion of hashish, (2) possession with intent to distribute LSD, and (3) possession with intent to distribute marijuana. I dissented from affirming the two distribution counts because the LSD and the marijuana were concealed and no evidence indicated which of the three roommates was responsible for these drugs. I concurred in affirming the possession count because the appellant was found next to the plainly visible hashish, various smoking apparatus lay around the room along with other evidence of frequent use, and appellant admitted using drugs there.

At the end of the government's case in chief, Herron moved for acquittal, arguing that the prosecution had failed to establish a prima facie case. In considering his claim that the trial court erred in denying his motion, we are allowed to consider only that evidence presented by the government up to that point in the trial. As the majority opinion details, that evidence showed that both Herron and Watson lived in, or at least frequented, the apartment. Heroin was found lying in the open on a dining room table. It was packaged as if for sale, in small foil packets approximately 1 inch by ¼ inch, and arranged in neat rows near $150–$200 in cash and other items on the table. Additional quantities of heroin, not essential to support his conviction, were found concealed in a bag behind the kitchen stove. An "amber-colored vial containing a leafy green vegetable material"[2]—later determined to be marijuana dusted with phencyclidine—was found atop the kitchen refrigerator. No fingerprints were taken of any of these drugs or their containers.[3]

Assuming that the law were a clean slate, several approaches would be open to one working with this evidence alone. First, one could hold all regular occupants of the apartment liable for possession of the drugs whether present or absent at the moment of the search. Second, one could hold liable only those found in the apartment at the time of the search. Third, one could hold none liable without additional evidence. Which of these three approaches one followed would depend on the elements of the crime (determined by its common law or statutory definition) and permissible factual assumptions about probable human behavior (that is, what inferences the law should permit a jury to draw *solely* from a defend-

ant's presence in a shared apartment where plainly visible containers holding illicit drugs are found in an area accessible to all residents [4]).

The elements of the crime of possession are supposedly settled. The District of Columbia statute governing simple possession reads:

It shall be unlawful for any person to . . . possess [or] have under his control . . . any narcotic drug . . ..

33 D.C. Code § 402(a). The statute has been construed to require *knowing* possession. *United States v. Weaver,* 148 U.S. App.D.C. 3, 458 F.2d 825 (1972). Similarly, the federal statute for possession with intent to distribute reads:

[I]t shall be unlawful for any person knowingly or intentionally . . . to . . . possess with intent to . . . distribute . . . a controlled substance . . ..

21 U.S.C. § 841. The indictment on both counts charged Herron with "knowingly and intentionally" possessing the drugs found in his apartment. "Knowing possession" requires (1) knowledge that one possesses certain items and (2) knowledge as to what those items actually are. *Cf. United States v. Freed,* 401 U.S. 601, 612, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (Brennan, J., concurring).

In case of constructive possession, additional proof of scienter is necessary to show the fact of *possession* itself apart from the knowledge underlying "knowing" possession. To paraphrase the standard jury instructions for the District of Columbia,

Constructive possession requires that a defendant know how to get at the narcotics (either directly or through an agent).

---

2. This is how the drug appeared to one of the DEA agents involved in the search. Tr. 63.

3. Tr. 37, 42.

4. Other factual patterns may present different questions and support different inferences. Among the relevant variables are:

(1) whether the defendant and/or anyone else is found in the apartment at the time of the search;

(2) the frequency with which the defendant occupies or visits the apartment;

(3) the number of people with access to the place where the drugs are found;

(4) whether the drugs are found in plain view or are concealed (this factor includes their packaging or container);

(5) other evidence establishing a particular person's nexus with the drugs, such as fingerprints, controlled buys, drug paraphernalia, etc.

Without such knowledge, the necessary "power" to exercise dominion and control is lacking. However, "mere presence in the vicinity of a narcotic drug, or *mere knowledge of its physical location*" is not sufficient as a matter of law to establish constructive possession. Even though someone has the "power" to exercise dominion and control over an object, he is not in constructive possession unless he also has the "intention" to do so.

*United States v. Davis,* 183 U.S.App.D.C. at 175, 562 F.2d at 694 (Bazelon, C. J., dissenting) (footnote omitted).

Thus, constructive possession supposedly requires proof that the defendant have (1) knowledge of where the items are located and how to get at them, (2) knowledge of what the items actually are (that is, that they are drugs and not something else), and (3) intent to exercise dominion and control over them. Does the evidence in this case show the presence of all these mental elements?

Inferring knowledge and intent beyond a reasonable doubt solely from a defendant's presence in a shared apartment where drugs are found in "plain view" would require that one make the following factual assumptions: Because the drugs are conspicuous, the defendant is very probably aware of their presence. Given the disapproval and danger that attach to possession of drugs, the defendant is very probably at least a co-venturer because he tolerates their presence and because his roommate (if the drugs are his) trusts him alone in the apartment with these openly visible items.

That these assumptions are highly questionable should be manifest. How probable is it that the defendant here actually knew what was inside the small foil packets lying on the table with other items, or knew that the "leafy green vegetable material" in the jar on the refrigerator was not oregano or tea? And even if he knew that the foil packets and jar contained illicit drugs how probable is it that he intended to exercise control over them, rather than merely believing them to be his roommate's property and none of his own business? Perhaps judges would waste no time in removing the drugs or themselves from the premises, but can a culpable mind be inferred from the failure of a person of a different background and outlook to do the same?[5]

Still more troubling would be the attribution of knowledge and intent to those residents of an apartment who were absent when a search occurred. How probable is it that they even saw the items lying on the table or refrigerator, this assumed observation being the premise on which all the other assumptions and inferences rest? Similarly, the inference of knowledge and intent would be extremely tenuous for all the occupants, absent or present, if the drugs were concealed, even if in a place accessible to all. In each case, the question is whether a reasonable person could find knowledge and intent beyond a reasonable doubt from this evidence alone.

*Some* relaxation of the scienter proof requirement might be reasonable. For example, the law might permit the presumption that a person generally knows the actual nature of objects in his possession. In the present case, this would mean that the jury would be allowed to assume that Herron knew the contents of the foil packets on the table and the jar on the refrigerator even though there was no evidence that he was familiar with foil packaging of heroin or the appearance of marijuana—*provided* these items were found to be in his possession.

What disturbs me far more is the relaxation of scienter in proving possession itself in cases of constructive possession. "Knowledge of how to get at drugs" can be inferred if they are in plain view, as they were here.[6] But that still leaves the re-

---

**5.** The young and other social groups may be sufficiently tolerant of drug use to invalidate the inference that continued proximity to drugs or frequent association with drug users implies participation. *See United States v. Davis,* 183 U.S.App.D.C. at 177, 562 F.2d at 696 n. 10 (Bazelon, C. J., dissenting).

**6.** I dissented in *Davis* largely because the drugs found there were concealed, thus undercutting the probability that the defendant was aware of

quirement of "intention to exercise dominion and control." If we overlook this requirement—that is, if we permit juries to convict without sufficient proof of this element—we will have moved to a standard of strict liability, so that everyone living in a residence, regardless of his actual knowledge or intent, will be deemed in possession of drugs found in a place accessible to all. In effect, this would mean that every person who shares an apartment would be obligated to discover and separate himself from a roommate who illegally possesses drugs. I suppose the justification for such a standard of strict liability would rest on a determination that the good to be achieved generally outweighs the unfairness of penalizing some persons lacking culpable intent:

> In the interest of the larger good [a standard of strict liability] puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger. . . .
>
> \* \* \* \* \* \*
>
> Hardship there doubtless may be under a statute which thus penalizes the transaction though consciousness of wrongdoing be totally wanting.[7]

their presence or knew how to get at them. Here, the drugs were in the open, giving more room for a contrary inference.

7. In at least two instances, the "hardship" might become unconstitutionally acute. If the defendant did not stand in sufficiently close "relation to a public danger" to do anything about it, it might be a violation of due process to hold him liable under any theory. A casual visitor to an apartment, for example, surely could not be held responsible for failing to discover the presence of concealed drugs. The "hardship" might also become unconstitutionally severe where the charge was possession with intent to distribute, a much more serious crime than simple possession. If an intent to distribute could be inferred merely from the packaging or quantity of drugs discovered, with no greater showing of nexus between the drugs and the defendant than that required for simple possession under a standard of strict liability, an individual could be subjected to harsh penalties simply for his failure to be more vigilant about his roommate's activities.

To alleviate this potential "hardship," the law could set different proof (and perhaps scienter) requirements for the two offenses. For example, if simple possession were a crime of strict

*United States v. Dotterweich,* 320 U.S. 277, 281, 284, 64 S.Ct. 134, 136, 138, 88 L.Ed. 48 (1943).

However, as the Supreme Court pointed out in *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), strict liability in the criminal law has generally been restricted to "regulatory" offenses where (1) "[t]he accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities" and (2) the "penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation." *Id.* at 256, 72 S.Ct. at 246. The Supreme Court has not "undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not," but the Court *has* indicated its misgivings about stripping "the defendant of such benefit as he derived at common law from innocence of evil purpose" in order to "ease the prosecution's path to conviction." *Id.* at 260, 263, 72 S.Ct. at 249. As I argued in

liability, possession with intent to distribute could be defined to require independent proof that the defendant knew of the drugs and intended to sell them. Knowledge and intent could not be inferred simply from the presence of the drugs in his shared apartment and their being packaged as if for sale.

It should be obvious that these relief-providing solutions are logically flawed. From the packaging of drugs one often can reasonably infer that *whoever* possesses them intends to sell them; and if we permit the conclusion that X possesses them, it should follow that X possesses them with the intent to distribute. The logical gap occurs at the first step, with the inference of possession. To correct for the possibility of error sanctioned at that stage, we tighten up the chain of inferences and requirements of proof at the second step, with the inference of an intent to distribute by a particular defendant. In doing so, we trade logical consistency for greater fairness with respect to those charged with possession with intent to distribute.

These constitutional questions were not presented to the panel and are not decided in the majority opinion.

**522**

*Davis,* 183 U.S.App.D.C. at 176–177, 562 F.2d at 695–696:

> If the Government is unable to pinpoint which cotenant is responsible for the presence of the drugs, it cannot sustain the charge against any of them, even though at least one is almost certainly guilty. But the alternative is conviction of the innocent with the guilty—something which has always been abhorrent to our legal traditions: "It is better that ten escape than that one innocent person suffer." Even where narcotics offenses or other crimes arousing great public outrage are involved, condemning the innocent is an intolerable price for letting none of the guilty escape.

(footnote omitted).

In cases of constructive possession, I do not think that requiring proof of intent places an impossible burden on the government. In the present case, for example, the DEA agents could easily have checked the foil packets and other items for appellant's fingerprints. If it had been shown that he handled the drugs, there would have been a much sounder basis for inferring that he intended to (and did) exercise control over them. Other kinds of circumstantial evidence of intent will often be available to substantiate a particular roommate's guilt.[8]

Unfortunately, these questions have already been answered—at least implicitly—by a panel of this court in *Davis.* By finding the exceedingly scant evidence there sufficient to establish a prima facie case, the court eviscerated the scienter requirements for constructive possession, reducing it to a crime of strict liability at least in the factual situation of that case. This case, though slightly different in its facts, is not distinguishable. Here, the drugs were in the open, not concealed as in *Davis.* Whereas in *Davis* two of the three roommates were found at home when the search occurred, here only Herron was found in the apartment, raising at least the inference that whoever controlled the drugs trusted him there alone. In light of *Davis,* I am compelled to concur in affirming this conviction.

---

8. *See United States v. Davis,* 183 U.S.App.D.C. at 177, 562 F.2d 696 (Bazelon, C. J., dissenting).