UNITED STATES of America, Plaintiff-Appellee,

v.

Harvey J. POWERS, Defendant-Appellant.

No. 18454.

United States Court of Appeals, Seventh Circuit.

Argued April 27, 1972.

Decided Sept. 12, 1972.

Rehearing Denied Nov. 8, 1972.

Robert S. Bailey, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Robert A. Filpi, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL and STEVENS, Circuit Judges, and LARAMORE,* Senior Judge.

PELL, Circuit Judge.

Harvey J. Powers, an attorney, and his client, Guido Fidanzi, were named in an eight-count indictment charging in the first seven counts various fraudulent acts of federal cognizance and in the eighth count, conspiracy concerning the fraudulent acts. Fidanzi pleaded guilty prior to trial. Powers was tried in a jury trial and was found guilty on Count II only, in connection with alleged mail fraud pursuant to 18 U.S.C. § 1341, pertaining primarily to one Bennie Beaird. This appeal followed.

The briefs of both Powers and the Government, presumably for differing influential purposes, have provided us with a scenario of the trial testimony showing the machinations of the defendants with numerous individuals and corporations. The parade of names and events, mostly having nothing to do with the points involved on this appeal, reads like an inadequate translation of a Tolstoi novel.

Some of the operations at least were handled through a corporation modestly named World Wide Mortgage Company. The extent of the financing as reflected by the evidence appears to have been the securing of advance finder's fees from persons who desired capital for high-risk business ventures, following which the further efforts to secure the loan evaporated along with the advance payment.

The specific count on which Powers was convicted involved an aborted loan to Beaird, a Peoria businessman. He sought to borrow $100,000 to buy stock in a fast food franchise operation which sold "barbecued pork things." Beaird testified that he had several meetings with Fidanzi and Powers as to the possibility of arranging such a personal loan; that Powers had always participated extensively in the discussions, often referring to what substantial sums of money World Wide had access to; and that after negotiations they had agreed on a $112,000 loan ($100,000 principal and $12,000 as a finder's fee, i. e., "12 points"). On December 12, 1964, Beaird and his partner, Lester Shallenberger, met Fidanzi and Powers and signed a loan agreement contract which provided that the advance fee less $100 would be refunded if World Wide failed to obtain the loan. Beaird and Shallenberger each gave Powers a certified check for $1120 (totaling $2240, or 2% of $112,000). Powers put the checks in his coat pocket and that was the last Beaird ever saw of either Powers or Fidanzi.

In order to tie Powers into the fraud as an active participant and not just as

---

* Senior Judge Don N. Laramore of the United States Court of Claims is sitting by designation.

the attorney for Fidanzi and/or World Wide, the Government adduced the testimony of Donald Blazavier.

Blazavier, whose testimony displays an excessively consistent guilelessness and a continuing willingness to part with his own or his mother's money in exchange for unkept promises, was apparently an employee of World Wide in December, 1964, although it is not clear that he was ever on the payroll. During the period of his association with World Wide, Fidanzi gave the Beaird checks to Blazavier to cash at a nearby bank—specifically telling him not to mention World Wide. After endorsing the checks, Blazavier was told by a teller that she could not cash them. Blazavier then returned the checks to Fidanzi.

At this point in his testimony, we reach one of the points raised on this appeal. In an earlier trial of Fidanzi for filing a fraudulent income tax return and for wilful failure to file returns [1] (No. 67 CR 561, aff'd, United States v. Fidanzi, 411 F.2d 1361 (7th Cir. 1969), cert. denied, 396 U.S. 929, 90 S.Ct. 265, 24 L. Ed.2d 227), Blazavier had testified, "Mr. Fidanzi put both of those checks [following the unsuccessful bank sortie] into his wallet and that was all I heard of it."

However, in the trial below, he testified that conversations with his wife had refreshed his recollection and that a few days later he had been given the checks again by Fidanzi and told to take them up to his hometown bank in Kenosha, Wisconsin, to cash them. This he did and he then turned over the proceeds, less $100 he had held out for his services, to Powers who was driving through, purportedly on the way to a closing in Milwaukee where the money was to be used. Blazavier was subjected to a searching cross-examination on this inconsistency.

The following then occurred:

MR. BAILEY: I have a few more questions, Judge, about that trial.

BY MR. BAILEY: Q. Were you aware when you testified there of the nature of that trial, sir? Did you know what the charge was?

MR. SKINNER: I object to that.

THE COURT: The objection is sustained.

\*    \*    \*    \*    \*    \*

THE COURT: \* \* \* I don't mean by my ruling to prevent you from asking other questions, but the question that you've asked is objectionable and I sustained the objection, and I'm only ruling on the question that was asked, nothing further.

If you have other questions in mind, proceed and I'll rule on any objections that may be made.

MR. BAILEY: I have no further questions.

Subsequently, before the witness was excused, but while no question was pending, the following side bar colloquy occurred:

MR. BAILEY: Well, Judge, what I think your Honor doesn't know is that the case against Guido Fidanzi was an income tax case for unreported income.

The Government in that case based on the testimony of this witness, that the checks went in his pocket, stuck Guido Fidanzi with this money as unreported income to him and used that evidence as the basis of a criminal conviction and a five-year sentence. I don't think the Government can stand up in one court in this building and say Guido got the money and then come and stand up in another court in this building and say Powers got the money.

THE COURT: All right, you've laid the foundation for impeachment and proceed accordingly. That is all I can rule on here. I can't rule on anything else.

1. Some of the income at least which the Government contended should have been reported was achieved through the swindling manipulations which were the subject of the present indictment.

MR. BAILEY: What I wanted to know is whether this witness knows what is happening?

THE COURT: We are not concerned with what he knows.

MR. SKINNER: The jury evaluates the evidence.

THE COURT: Your question was objectionable and I sustained it.

MR. BAILEY: If that is your Honor's ruling—

THE COURT: Well, it is my ruling.

MR. BAILEY:—but I want your Honor to be aware of all the facts that I am aware of.

THE COURT: Whether this witness is aware of anything on these things is not pertinent here. But the question that you put was objectionable and I sustained that objection.

As a part of the direct testimony of the defense, Special Agent Kurash of the Internal Revenue Service was called as a witness. Powers cites us to the following portions of the transcript in connection with the testimony of Kurash:

MR. BAILEY: * * * Would you tell the court and the jury, Agent Kurash, how long you were assigned to investigate the tax liabilities of Guido Fidanzi?

MR. SKINNER: I object.

THE COURT: The objection is sustained.

MR. BAILEY: I have to be heard on this, Judge.

THE COURT: Oh, we don't have to be heard. I will sustain the objection.

BY MR. BAILEY: Q. Did you eventually determine whether or not you would charge the proceeds of Government's Exhibits 6 and 6–A to Guido Fidanzi as income to him, sir?[2]

MR. SKINNER: Objection.

THE COURT: The objection is sustained.

MR. BAILEY: If I may, your Honor, this is the precise point that

was involved yesterday. I want to argue—

THE COURT: I heard your statement yesterday, and I am sustaining the objection.

\* \* \* \* \* \*

BY MR. BAILEY: Q. What if any determination did you make, sir, in the Internal Revenue Service, about whether or not the proceeds of 6—Government's Exhibits 6 and 6A were income, and to whom?

MR. SKINNER: Objection.

THE COURT: Sustained.

MR. BAILEY: One moment, your Honor.

BY MR. BAILEY: Q. Agent Kurash, sir, did you on any previous occasion in this building, under oath, testify that the proceeds of Government's Exhibits 6 and 6A were chargeable as income to Guido Fidanzi?

MR. SKINNER: Objection.

THE COURT: The objection is sustained.

MR. BAILEY: No further questions.

The foregoing matters are the basis of Powers' most significant contention for reversal. As stated by him, the district court erred in refusing to give effect to the fundamentally inconsistent positions the Government has previously espoused. We do not agree.

We do not say, because we do not need to reach the question, that the Government's position in a prior criminal trial may never be asserted in some form against the Government in subsequent criminal litigation.

■ Thus, if the defendant had made a record by appropriate offer to prove of the fact that the Government had successfully prosecuted Fidanzi for tax evasion in connection with his sole receipt of certain specified items of income, this being done in a case in which the Government was attempting to prosecute Powers for his sole receipt of the identi-

2. Government Exhibits 6 and 6–A were the Beaird checks totalling $2,240.

cal items of income, then notwithstanding the implications of cases such as United States v. Santos, 372 F.2d 177, 180 (2d Cir. 1967), we might have to give serious consideration to whether the offer to prove should not have been sustained on the basis, at the very least, that it concerned a judicial admission of the Government. The offered proof, of course, would have to go beyond the mere fact of an indictment. *Cf.* Falter v. United States, 23 F.2d 420 (2d Cir. 1928), cert. denied, 277 U.S. 590, 48 S.Ct. 528, 72 L.Ed. 1003.

But this is not the situation before us although in his argument Powers would have us consider his case as substantially similar in legal effect to that postured above.

■■■ As a matter of fact, Powers first contends that the Government was collaterally estopped in his case because of the prosecution of Fidanzi. Even if we were to hold that the doctrine of collateral estoppel could be applied to a situation where there was a lack of mutuality of parties, *cf.* Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed. 2d 469 (1970), and even if the matter of the prior litigation had been properly presented on the record below, the doctrine of collateral estoppel would not be appropriate here as Powers' trial did not involve the relitigation of an ultimate fact.

Collateral estoppel, as defined in Ashe v. Swenson, "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." 397 U.S. at 443, 90 S.Ct. at 1194. There is no such inconsistency between Fidanzi's conviction on the tax case and Powers' claimed guilt in the present case. First, it is clear that the jury in Fidanzi's tax case could have found that his income was in excess of $600 without attributing the two checks in question to him since there was another $9,000 in income charged to him by the Government. But, equally important is the fact that Powers could have been

guilty of mail fraud in this case without ever having received any of the proceeds of the check. One does not have to share in the proceeds of a crime to be guilty of the crime.

There is no necessary inconsistency between money being handed to one person and liability for not paying tax on that money being chargeable to another person who was the ultimate recipient.

More fatal, however, to Powers' contention, either on a collateral estoppel basis or on his secondary basis that evidence of the claimed governmental inconsistent position should have gone before the jury for whatever weight it might have as a judicial admission, is the state of the record before us. The Government concedes on this appeal that the underlying facts which Powers' counsel *told* the judge about at a side bar conference might have been significant as reflecting a negation of a motive of personal gain on the part of Powers derived, if it was a fact, from the non-receipt of the money as his own income.

Turning to the record which we have quoted hereinbefore, we first look at Blazavier's cross-examination. The only questions asked to bring in the point here asserted were whether the witness was aware of the nature of the trial or what the charge was.

■ The objection could properly have been sustained as to the particular question because of its duplicitous nature. The witness may have been aware of the nature of the trial but not have known what the charge was and therefore he would have been unable to respond either in the affirmative or the negative.

However, of greater significance to the present contention is that this double question simply had no significance. We can find no materiality in whether the witness did or did not know of the nature or of the charge of the previous case in which he had testified. We cannot assume that a witness tells other than the truth in response to questions, irrespective of the nature of the litigation.

The district court did not prohibit, indeed did not even chill, a proper pursuit

of the subject. He stated he was ruling "on the question that was asked, nothing further." He told counsel if he had other questions to proceed. Counsel had no further questions.

It is true that subsequently at a side bar conference, Powers' counsel *told* the judge that Fidanzi had been charged in the tax case with the receipt of that income. Again, he was informed that the question he had put was objectionable. The matter was not pursued and as we have already observed the only other aspect of Blazavier's testimony here, the inconsistency between the two trials, was brought out by way of impeachment.

The cited attempt to bring in the matter by testimony of Special Agent Kurash was equally nonproductive on the point that Powers on appeal contends is involved. The questions put to Kurash, to which objections were sustained, do not tend to prove that the Government, as opposed to one of its employees, had taken an inconsistent position.

■ The first in the series of questions as to how long Kurash had been assigned to the Fidanzi tax investigation was apparently only isagogic and while innocuous also did not in the prohibition of its answer give rise to any error.

The second and third questions pertained to the agent's determination as to whether the proceeds of the Beaird checks were taxable income to Fidanzi and whether they were income and to whom.

■ The determination of the agent falls squarely within the rule enunciated in United States v. Santos, *supra,* which we adopt. The objections to these questions were properly sustained.

■ The fourth question asked the agent whether on a previous occasion he had testified that the proceeds of the Beaird checks were chargeable as income to Guido Fidanzi. If the agent had testified in the Powers trial as an adverse witness to the contrary of that which he had testified in the Fidanzi case, then the question would have assumed the proportions of a foundation for impeaching him

as a witness. Kurash, however, had not testified in the Powers case, indeed, was Powers' own witness and not, as such, subject to impeachment by Powers.

■ *Santos* would seem to say that inconsistent statements of a Government agent made in the course of the exercise of his authority would be admissible only for the purpose of impeachment of the agent as an individual witness. Reasons of policy are advanced for differentiating the Government agent from the ordinary agent. 372 F.2d at 180.

Even if we were to say here, however, that the fourth question was an initial step in testamentary development of proof that the Government, as opposed to any individual agent thereof, had taken an inconsistent position earlier with regard to the checks, while it is questionable that the fourth question really opens that door at all, the fact remains that after the question was asked no further attempt was made whatsoever to follow up or to pursue this line of proof. We do not conceive that the rulings here were such as to chill some reasonable effort at making a record. Instead, no further interrogation occurred, and there was no offer of proof whatsoever as to what the answers would have been if the witness had been permitted to answer the questions. No effort was made to ask the agent questions concerning the overall prosecution of Fidanzi by the Government. At best the questions were keyed to Kurash's personal evaluations and opinions which would not be in themselves binding on the Government.

We cannot say on the posture of the record before us that there was plain error requiring reversal. Rule 52(b), Fed.R.Crim.P.

■ Finally, on a subsequent day in the trial, Powers moved to strike the testimony of Blazavier to the effect that he had paid the proceeds of the two checks to Powers. This testimony might have been subject to impeachment and the impeaching matter had been presented to the jury. Inconsistency in testimony given in a trial with earlier statements

in court or out of court is not ordinarily a basis for striking the testimony and it was not here.

■ The presentation, however, of the motion to strike was supported by a copy of the Government's brief on the appeal of the Fidanzi tax case to this court. This brief contained statements which were the only matters coming at all close to the point Powers is asserting on the present appeal. However, the brief was put before the court only as an exhibit to the motion which was properly overruled. The entire colloquy on the motion was out of the presence of the jury and the brief was not offered into evidence in the trial.

We conclude therefore that the matter here urged was not presented in such a manner as to bring the question before us. We do not consider the matter as being one of plain error under Rule 52 (b), Fed.R.Crim.P. Our holding is not on the case that might have been but on the record before us. Consequently, we have not found it necessary to consider the arguments of the Government, irrespective of the merit they may have, that the determination of the tax incidence of the proceeds of the Beaird checks could not be used as an admission because they were not inconsistent with the Government's position in the present fraud case.

The other contentions of Powers merit less extended consideration.

■ One of these concerned excluded testimony of a former assistant state's attorney that at a time some two years after the last date established in the Government's proof and almost two years after Powers, according to his own testimony, had discovered Fidanzi's fraud and had severed all connection with him, Powers had told the assistant state's attorney that Fidanzi had used his name in the perpetration of various frauds. Powers asserts that the testimony should have been admitted to show his good faith.

While the district court's announced characterization of the proposed testi-mony as "self serving" would seem to be a questionable basis for exclusion (see, e. g., Smith v. United States, 385 F.2d 252, 254 (8th Cir. 1967)), we cannot say that exclusion of the statements made as remotely after the fact as here was an abuse of the wide discretion permitted to the judge in this situation. See Hayes v. United States, 227 F.2d 540, 543 (10th Cir. 1955).

■ Powers' final contention concerns the cross-examination of James Doherty, the first of the defendant's nine character witnesses. On direct examination Doherty testified that Powers had a good reputation "in the community of which both he and yourself are a part" for honesty and integrity, and for truthfulness and veracity. It would appear that reference was to the legal rather than the residence community. On cross-examination the prosecutor sought to test the witness' credibility by asking whether he "had heard that [the defendant] had three complaints pending before the Chicago Bar Association?" The witness answered the question, denying knowledge of the complaints, before defense counsel objected. The court sustained the objection. No motion for a mistrial was made. There, of course, was no motion to strike the answer for if anything it was favorable to the defendant. There was no motion that the jury be admonished to disregard the question. No further reference to these complaints was made during the examination of Powers' other eight character witnesses or at any point in the trial. The defendant on appeal claims that "[t]he very asking of that question was plain error requiring the trial judge to declare a mistrial." We do not agree.

We note that the ruling of the district court is arguably questionable. In Michelson v. United States, 335 U.S. 469, 483, 69 S.Ct. 213, 222, 93 L.Ed. 168 (1948), the Supreme Court in dealing with an analogous matter stated:

"The inquiry as to an arrest is permissible also because the prosecution has a right to test the qualifications of the witness to bespeak the com-

munity opinion. If one never heard the speculations and rumors in which even one's friends indulge upon his arrest, the jury may doubt whether he is capable of giving any very reliable conclusions as to his reputation."

A complaint before the bar association, if publicly known to the legal community, would, like an arrest, be an accusation of misconduct, which although untested would be an event about which lawyers would normally comment. Furthermore, complaints before the bar association would seem to be directly relevant to the defendant's reputation for those traits of honesty and integrity which were expressly put in issue.

We also note that the jury was given the customary instruction that the jury should not consider testimony to which an objection had been sustained.

We need not decide whether the judge's ruling on the question was proper, however, for under the circumstances of lack of motion for mistrial, no motion to admonish the jury to disregard the question, and lack of any showing of any significance being attached to the particular question during the remainder of the trial, we are not prepared to say it was plain error requiring reversal. Rule 52 (b), Fed.R.Crim.P.

For the reasons hereinbefore set out the judgment of the district court is affirmed.

Affirmed.

STEVENS, Circuit Judge (dissenting).

Powers, an attorney, and Fidanzi, his client, were named as codefendants in each count of an eight count indictment. Fidanzi entered a plea of guilty on all eight counts. Powers' defense was that his participation was as a lawyer, not a principal. The defense was successful on seven of the eight counts. With respect to the one count on which the jury found Powers guilty, the government introduced evidence tending to prove that he personally received the proceeds of two checks amounting to $2,240.

In a prior criminal proceeding, Fidanzi was convicted of wilfully failing to file an income tax return for the year 1964. In that trial the government charged that Fidanzi had unreported income of $11,-240, including the proceeds of the two checks for $2,240 which were offered against Powers in this case. Thus, in the Fidanzi trial the government formally contended that the entire benefit of the $2,240 was Fidanzi's; in the Powers trial the government formally contended that the benefit of the same $2,240 was Powers'. The government successfully prevented Powers from bringing this inconsistency to the attention of the jury.

Because of the difference in parties, and because neither of the inconsistent positions was essential to either verdict, I agree that no estoppel barred the second trial or, indeed, the government's change of position. I also assume that the mere fact that a government agent had placed a particular interpretation on a past transaction, and either gave testimony or executed an affidavit setting forth that interpretation, would not be admissible except to impeach that agent. *Cf.* United States v. Santos, 372 F.2d 177, 180–181 (2d Cir. 1967). I believe, however, that a more basic issue is raised when the sovereign itself takes inconsistent positions in two separate criminal proceedings against two of its citizens.[1]

The inconsistency may be justified or explained by newly discovered evidence or by more accurate analysis of facts which were always available. But in my opinion the fact of the inconsistency may properly be brought to the attention of the jury and the government put to the burden of explaining how it could argue that the same transaction can prove, beyond a reasonable doubt, two mutually

---

1. The United States, like other inanimate persons, must, of course, act through its agents. However, just as formal action by a board of directors may clearly evidence the position of a corporation, so does the formal prosecution of a criminal trial establish the position of the United States and not merely the views of its agents who participate therein.

exclusive propositions. I think Powers was entitled to prove that the government had formally contended, in the course of a criminal trial resulting in the conviction of Fidanzi, that the entire proceeds of the checks for $2,240 constituted income to Fidanzi.[2]

There is no question in my mind that Powers' inability to bring this fact to the attention of the jury may well have been the critical difference between his conviction and his possible acquittal. The defect in the record was one "affecting substantial rights" of the defendant within Rule 52(b), Fed.R.Crim.P. Moreover, Powers' theory of admissibility was plainly explained to the trial court.[3] The narrow issue which then remains is whether any of the questions propounded by Powers' counsel for the purpose of proving the position taken by the government in the Fidanzi trial should have been answered.

Having concluded that the ultimate proposition which Powers sought to establish was relevant, I also conclude that one proper method of bringing this matter to the attention of the jury was through the testimony of the government agent, Kurash, who not only had analyzed the specific transaction but also testified at the Fidanzi trial. Powers proffered his testimony,[4] not as in *Santos* for the purpose of proving that a government agent had made an admission which was binding on his principal, but rather for the purpose of explaining the position his principal had formally asserted in the trial of Fidanzi. I believe the proffered testimony of Kurash should have been received.[5]

I therefore respectfully dissent. I would reverse and remand for a new trial.

2. In his argument to the jury in the Fidanzi trial, government counsel stated: "For '64 we charged $11,240 and we proved just that. He received a gross income of $11,240. He was supposed to file a return, he knew it, and he didn't, and he wilfully failed to file." Tr. 829, United States v. Fidanzi, 411 F.2d 1361 (7th Cir. 1969).

3. "MR. BAILEY: Well, Judge, what I think your Honor doesn't know is that the case against Guido Fidanzi was an income tax case for unreported income. The Government in that case based on the testimony of this witness, that the checks went in his pocket, stuck Guido Fidanzi with this money as unreported income to him and used that evidence as the basis of a criminal conviction and a five-year sentence. I don't think the Government can stand up in one court in this building and say Guido got the money and then come and stand up in another court in this building and say Powers got the money." Tr. 504.

4. Kurash was the first witness called by the defense; thus, the admissibility of his testimony, unlike the questions propounded to Blazavier, was not limited by the scope of the government's examination or by the court's discretion as to the proper limits on cross-examination.

5. Moreover, since the trial judge indicated that he considered this line of inquiry irrelevant after having been advised of Powers' theory of admissibility (Tr. 504–05, 575–76), I am satisfied that no useful purpose would have been served by any further attempts to make an adequate record for appeal. Indeed, proper respect for the trial judge's position should excuse trial counsel from the necessity of correcting any minor deficiencies in the form of the questions already put.