UNITED STATES of America

v.

William D. MORGAN, Appellant.

No. 77–1571.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 9, 1978.

Decided June 7, 1978.

**934**

Appeal from the United States District Court for the District of Columbia (D.C. Criminal 77-00077).

Tom M. Schaumberg, Washington, D. C. (appointed by this Court), for appellant.

Regina C. McGranery, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Before BAZELON, McGOWAN and MacKINNON, Circuit Judges.

Opinion for the Court filed by Circuit Judge BAZELON.

Concurring opinion filed by Circuit Judge MacKINNON.

BAZELON, Circuit Judge:

Appellant, William Morgan, was found guilty by a jury of possessing phenmetrazine with intent to distribute in violation of 21 U.S.C. § 841(a) (1970). We agree with his contention that the trial judge erred in excluding certain evidence from the jury.

I

On January 6, 1977, officers of the Metropolitan Police Department obtained a warrant to search for illegal drugs in a single-family dwelling in Northwest Washington, D.C. The warrant was issued upon the affidavit of Detective Mathis, stating that a reliable informant had advised him that a black male, age 22 to 24 and known as "Timmy," was selling drugs from inside the house; that "within the past 48 hours" Mathis had gone to the house with the informant and waited outside while the informant made a "controlled" buy; that upon rejoining Mathis, the informant handed him some pink pills, later identified as phenmetrazine; and that the informant said he had purchased these pills from Timmy.

When the officers arrived at the house at 10 p. m. to execute the warrant, they did not find Timmy but instead came across appellant and four other persons in the front hallway. Tr. 8, 250, 256. Appellant was holding the leash on a snarling German shepherd. According to the officers, appellant immediately reached in his pocket with his free hand, grabbed some pink pills, threw them on the floor, and started to mash them with his foot. Tr. 8. Detective Mathis managed to recover intact twelve of the pills,[1] which subsequently were determined to be phenmetrazine. A search of the basement resulted in seizure of seventy-seven additional such pills and $30 cash, found in a shaving kit secreted in a hole in the ceiling, Tr. 17; $4,280 cash, found in a fuse box, Tr. 42; $410 cash, found in a dresser drawer, Tr. 15; the birth certificate of a Kelsey Etheridge, found in an unidentified article of clothing on a chair, Tr. 265; and Etheridge's school identification, found on top of a television, Tr. 266. No fingerprints were taken from any of these particular items, Tr. 47–48, and no fingerprints were introduced at trial. Besides appellant, at least six other persons were in the house when the police arrived, Tr. 123–124, 250, including the four who were in the hallway.

At trial, the government sought to connect appellant not merely with the twelve pills seized from the floor in the hallway but also with the seventy-seven pills and $4,280 cash found in the basement. The

1. Mathis testified at trial that he also recovered two fragments, thus about 13 pills in all. Tr. 9. Another officer's testimony suggests that three additional pills may have been crushed during the commotion. Tr. 79.

owner of the house, Mrs. McKnight, testified that she had known appellant for about two years and that he came to her home daily to feed and exercise her dogs, which were chained in the basement. Tr. 57–62. Appellant, she said, was the only person regularly in the house who was not afraid of the dogs. Tr. 60. She also stated, however, that with the exception of Etheridge, who used the basement bathroom, no one had lived in the basement since October 1976.[2] Tr. 61–63.

Appellant testified that he resided in Southeast Washington with his sister and brother. Tr. 206. On the evening of the search, he had gone to Mrs. McKnight's house to invite one of the occupants, a William Taylor, to go with him to a party.[3] Tr. 206–207. He denied dropping any phenmetrazine, and claimed to have no knowledge of the drugs or money found in the basement.[4] Tr. 217–219, 240, 243. He admitted that he did take care of the dogs, however, and thus came to the house and entered the basement every other day. Tr. 213, 223.

Three times during the trial defense counsel sought to establish that Timmy, Mrs. McKnight's son, lived in the house and was selling drugs.[5] Counsel proffered as evidence of this fact the statements made by the informant to Detective Mathis that

---

2. The evidence about who lived in the basement and who did not was rather muddled. *Compare* Mrs. McKnight's testimony *with* testimony of Detective L. Ware, Tr. 118–19. Of course, even if the evidence established conclusively that appellant was the sole occupant of the basement, it would not necessarily follow that he knew about, and possessed with intent to distribute, the narcotics secreted in the basement ceiling. *See* Part II(A) *infra*.

3. Taylor corroborated this explanation. Tr. 125.

4. Two of the persons in the hallway with appellant when the police arrived, William Taylor and William Anthony Jr., testified for the defense. Each said he did not see appellant drop pills on the floor, did not see him attempt to crush them, and did not see the officers stoop to pick them up. Tr. 128, 263.

5. Defense counsel first sought to raise this issue while cross-examining Mrs. McKnight. Counsel asked whether she knew about Timmy's drug dealings. The prosecutor objected on grounds that there was no "evidence presented before this jury to suggest anything of this sort." Tr. 67. At the bench, counsel explained that the factual predicate for the question was the *affidavit of Detective Mathis* stating that he had been advised by an informant that Timmy was selling drugs from the house and had sold some to the informant. Tr. 67–68. The trial judge ruled that the affidavit did not provide a foundation for impeaching Mrs. McKnight. Tr. 68.

Next, the defense tried to raise the issue while cross-examining Detective Harvey Norris, offered by the prosecution as an expert on the practices of narcotics dealers. Counsel asked whether "if you were told that somebody else who did live in that house was distributing phenmetrazine, would that influence your conclusion [that the pills in appellant's pocket were possessed for purposes of distribution] . . . ?" Tr. 113. The prosecutor objected, again on grounds that there was no foundation for the question, and the trial judge agreed: "[W]e don't have the record on which to base that hypothetical." Tr. 114.

The final effort to raise the issue occurred when defense counsel proposed to recall Detective Mathis to ask him about the references to Timmy in the affidavit. Tr. 269–71. This time the prosecutor objected on the following grounds:

Your Honor, [this is] . . . hearsay testimony. This witness did not witness a sale, if you will read the affidavit. He witnessed an individual [the informant] go to the front of the house and that was it. The rest of the testimony is totally hearsay. The fact that on the prior occasion, two or three days before, somebody else may also have sold drugs out of that house is *irrelevant* to the *determination of whether this individual is guilty of the crime charged.*

Tr. 271–72 (emphasis supplied). Agreeing with the prosecutor, the trial judge found that the proffered evidence was "not relevant to this case. . . . [and was] hearsay. . . ." Tr. 272–73. He also rejected counsel's suggestion that, if the identity of the informant could not be disclosed (to cure any hearsay problem), a "missing witness" instruction would be an appropriate substitute. *Id.*

Since we conclude that the proffered evidence was neither irrelevant nor hearsay, and that the decision by the trial judge to exclude it was reversible error, it is not necessary for us to consider whether the trial judge was correct in rejecting use of the affidavit as a foundation for impeaching Mrs. McKnight, for posing a hypothetical question to Sergeant Ware, and for requiring either disclosure of the informant's identity or a "missing witness" instruction.

are contained in the affidavit supporting the search warrant. The trial judge excluded this evidence on grounds that it was irrelevant and was hearsay.[6]

## II

Morgan contends that the informant's statements were neither (a) irrelevant nor (b) hearsay under the Federal Rules of Evidence, and that their exclusion was highly prejudicial.

### A. RELEVANCY

■ The district court has wide discretion to admit or exclude evidence where the question is one of relevancy or materiality. *See, e. g., United States v. Hallman,* 142 U.S.App.D.C. 93, 94, 439 F.2d 603, 604 (1971); *Holt v. United States,* 342 F.2d 163, 166 (5th Cir. 1965). We find an abuse of such discretion here, however, since it plainly appears that the excluded evidence bears on a matter that could be determinative of guilt or innocence.

■ When illicit drugs are found in an area accessible to two or more people, any one, or all of them might be criminally culpable. Whether the government charges all of them, or only one, the threshold question for the jury is the same: *Who had possession?* To convict a particular defendant of possessing illegal drugs, the jury must conclude beyond a reasonable doubt that that defendant knew about their presence and intended to exercise dominion and

control over them. 33 D.C.Code § 402(a); *United States v. Weaver,* 148 U.S.App.D.C. 3, 458 F.2d 825 (1972). To convict a particular defendant of the more serious crime of possession with intent to distribute, the jury must be willing (where there is no evidence of actual distribution) to find beyond a reasonable doubt that that defendant would not have possessed so substantial a quantity of drugs if he merely intended to use them himself. *United States v. Herron,* 185 U.S.App.D.C. 403, 406, 567 F.2d 510, 513 (1977); *United States v. James,* 161 U.S. App.D.C. 88, 112, 494 F.2d 1007, 1031, *cert. denied,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974).

■ In this case it is not clear whether the jury found that appellant intended to distribute the twelve pills which he assertedly threw on the floor or the seventy-seven pills found in the basement.[7] In either event, however, evidence that another person was selling phenmetrazine from the house was decidedly relevant. If the jury had believed that "Timmy" was a dealer in residence, it might have concluded that appellant had merely purchased the twelve pills found in his possession from Timmy, and that Timmy, not appellant, exercised dominion and control over the seventy-seven pills in the basement with intent to distribute them. Since there was no evidence of actual sales by appellant, the jury was asked to rely solely on speculative inferences about intent to distribute.[8] It

---

6. *See* note 5 *supra.*

7. The jury was told that it could base a finding of intent to distribute on either quantity of phenmetrazine. Detective Norris, the government's expert on narcotics dealers, testified that in his opinion *both* the pills seized from the floor in the hallway and those seized from the basement ceiling were possessed for such a purpose. Tr. 110–11. He indicated that even 12 or 13 pills "would be more than a user could probably use in a week's time." Tr. 111. And in charging the jury with respect to the mental state required for conviction, the trial judge said simply that defendant must have possessed "some measurable amount of the controlled substance," Tr. 296–97, with a "specific intent" to distribute. Tr. 299.

8. To convict based on the drugs assertedly in appellants' *actual* possession (those in his pocket), the jury would have had to find beyond a reasonable doubt that he would not have had 12 or 13 pills on his person for a purpose other than distribution—e. g., that he was not merely taking the pills with him for his own use. To convict based on the drugs assertedly in appellants' *constructive* possession (those concealed in the basement ceiling), the jury would have had to find that he (1) had knowledge that a shaving kit was located there, (2) had knowledge that the shaving kit contained drugs and not something else, (3) intended to exercise dominion and control over the drugs, rather than simply tolerating their presence, and (4) possessed them specifically for purposes of distribution—e. g., not as a year's supply for himself.

might not have drawn such inferences if the evidence suggested that a third person was the distributor. Under these circumstances, we see no basis to exclude evidence of actual sales by a third person on grounds of relevancy.

## B. HEARSAY

■ The Federal Rules of Evidence specifically provide that certain categories of out-of-court statements offered to show the truth of the matter asserted shall not be regarded as "hearsay." [9] Under Rule 801(d)(2)(B) such a statement is not barred as hearsay if a party-opponent "has mani-

fested his adoption or belief in its truth . . .." This Rule plainly applies to the informant's statements to Detective Mathis. The government manifested its belief in the truth of the informant's statements about Timmy by characterizing them as "reliable" in a sworn affidavit to a United States Magistrate.[10]

Notwithstanding the plain language of the Rule, the government urges us to hold it inapplicable to the prosecution in criminal cases. The government's position is based on public policy grounds, and has been accepted, it says, by the Courts of Appeals for the Second, Sixth, and Seventh Circuits.[11]

For the views of the author of this opinion about the validity of these assumptions where, as here, more than one person potentially has access to the drugs and could be responsible for them, see generally United States v. Herron, 185 U.S.App.D.C. 403, 567 F.2d 510, (1977) (Concurring opinion of Bazelon, C. J.).

9. Rule 801(d) provides:
    (d) Statements which are not hearsay. A statement is not hearsay if—
    (1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (B) consistent with his testimony and is offered to rebut an express or implied charge against him or recent fabrication or improper influence or motive, or
    (2) Admission by party-opponent. The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

10. We note that the Federal Rules clearly contemplate that the federal government is a party-opponent of the defendant in criminal cases, and specifically provide that in certain circumstances statements made by government agents are admissible against the government as substantive evidence. See Rule 803(8). We note also that, at least in this jurisdiction, Assistant United States Attorneys, who represent the government in criminal cases, approve ap-

plications for warrants before they are presented to the Magistrates. See United States v. Strother, 188 U.S.App.D.C. 155, at 159, 578 F.2d 397, at 401 (D.C.Cir. 1978); Dorman v. United States, 140 U.S.App.D.C. 313, 323, 435 F.2d 385, 395 (1970). Though the proposition seems self-evident, it bears mention that when the government authorizes its agent to present his sworn assurances to a judicial officer that certain matters are true and justify issuance of a warrant, the statements of fact or belief in the officer's affidavit represent the position of the government itself, not merely the views of its agent. Cf. United States v. Powers, 467 F.2d 1089, 1097 n. 1 (7th Cir. 1972), cert. denied, 410 U.S. 983, 93 S.Ct. 1499, 36 L.Ed.2d 178 (1973) (dissenting opinion of then Circuit Judge Stevens).

11. The government relies on United States v. Pandilidis, 524 F.2d 644, 650 (6th Cir. 1975), cert. denied, 424 U.S. 933, 96 S.Ct. 1146, 47 L.Ed.2d 340 (1976); United States v. Powers, 467 F.2d 1089, 1095 (7th Cir. 1972), cert. denied, 410 U.S. 983, 93 S.Ct. 1499, 36 L.Ed.2d 178 (1973); and United States v. Santos, 372 F.2d 177, 180 (2d Cir. 1967).

The public policy argument is explained only in the Santos opinion and, we think is somewhat difficult to grasp. The court in that case seemed to be distinguishing government agents from nongovernment agents (whose statements regarding matters within the scope of the agency may be attributed to their principals, see note 15 infra and accompanying text) on the rationale that government agents are "supposedly uninterested personally in the outcome of the trial." 372 F.2d at 180 (emphasis supplied). The court did not explain the significance of this premise. We are not told whether it follows that (a) it would be unfair to impute to the government responsibility for the statements of its agents, or (b) such statements lack the special assurances of trustworthiness that attend

All of the cases on which it relies, however, save one, were decided before the Federal Rules of Evidence were made effective by Congress.[12] And that one, *United States v. Pandilidis,* 524 F.2d 644 (6th Cir. 1975), *cert. denied,* 424 U.S. 933, 96 S.Ct. 1146, 47 L.Ed.2d 340 (1976), decided several months after the effective date of the Rules,[13] does not discuss their possible applicability. Moreover, there is nothing in the history of the Rules generally or in Rule 801(d)(2)(B) particularly to suggest that it does not apply to the prosecution in criminal cases.[14]

Most basically, we think the government reads too much into the position taken by our sister Circuits. None of the cases on which it relies deals with the problem of out-of-court statements in which the government itself has manifested its "adoption or belief." Rather, to the extent these cases survive publication of the Federal Rules, a question we need not decide

here, they establish only that the prosecution is excepted from the general rule that admissions made by an agent during the course of the agency and concerning matters within the scope of the agency are binding on his principal.[15] Clearly, statements in which the government has manifested its "adoption or belief" stand on more solid ground than mere out-of-court assertions by a government agent. We do not decide that just *any* statement the informant might have made is admissible against the government. We decide only that where, as here, the government has indicated in a sworn affidavit to a judicial officer that it believes particular statements are trustworthy, it may not sustain an objection to the subsequent introduction of those statements on grounds that they are hearsay.

---

the out-of-court statements of nongovernment agents.

Whether or not this view of public policy survives publication of the Federal Rules of Evidence, *see* note 15 *infra,* we fail to see what possible bearing it could have on this case. It may be true that the informant was not interested personally in the outcome of a particular criminal proceeding when he spoke to Detective Mathis, that it would be unfair to find that he was speaking for the government at the time, and that, at that time, his statements lacked special assurances of trustworthiness. But the question we must consider is whether, once the government indicates its belief that an informant's assertions are trustworthy, it may *then* turn around and object to their admission on hearsay grounds. On that question the *Santos* policy argument has nothing to say.

**12.** The Federal Rules became effective one hundred and eighty days after they were approved by Congress on January 2, 1975. Pub.L.No. 93–595, § 1, 88 Stat. 1929.

**13.** *Pandilidis* was argued in December 1974, before the Rules were approved by Congress, and was decided in October 1975, several months after their effective date. *See* note 12 *supra.* No mention of the Rules appears in the court's opinion.

**14.** *See generally* Notes of Advisory Committee on Proposed Rules, printed in 28 U.S.C. App. (Supp. VI 1976) 2346–47; S.Rep.No. 93–1277, 93d Cong., 2d Sess. 15–16 (1974); H.R.Rep.No. 93–650, 93d Cong., 1st Sess. 13 (1973), U.S. Code Cong. & Admin.News 1974, p. 7051.

**15.** In *United States v. Pandilidis, supra,* the court held that it was not error to exclude evidence that an agent of the Internal Revenue Service (IRS) believed defendant guilty of nothing more than a civil offense. 524 F.2d at 650. In *United States v. Powers, supra,* the court approved exclusion of an IRS agent's opinions about whether the proceeds from certain checks were taxable income. 467 F.2d at 1095. And in *United States v. Santos, supra,* the court held that the trial judge properly excluded a sworn statement by a narcotics agent indicating that he had witnessed the assault and that persons other than defendant were responsible for it. 372 F.2d at 179. It should be noted that in two of these cases, *Pandilidis* and *Santos,* the court did not address the question whether the government itself had taken the position that its agent's statements were true. In *Powers,* however, the court implied that if the government had in fact taken such a position, a different result might have been required. 467 F.2d at 1095.

It is not clear whether these cases survive the Federal Rules. Rule 801(d)(2)(D) provides that statements made by an "agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship" shall be treated as admissions by his principal. As in the case of Rule 801(d)(2)(B), there is no indication in the history of the Rules that the draftsmen meant to except the government from operation of Rule 801(d)(2)(D) in criminal cases. But consider in this connection the possible significance of Rule 803(8).

## ■ C. HARMFULNESS [16]

■ The government's evidence that appellant possessed phenmetrazine with intent to distribute was entirely circumstantial. There was no evidence that appellant had actually sold phenmetrazine at any time. No fingerprints of his were found on any of the items concealed in the basement. And there was evidence that at least one other person, Kelsey Etheridge, was not afraid to enter the basement. Hence the jury necessarily engaged in speculative inferences to convict. We cannot say with the necessary "fair assurance" that the jury would have drawn those inferences if it had been informed of sales by a third person living in the house. *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Smith,* 172 U.S. App.D.C. 297, 310, 521 F.2d 957, 970 (1975); *United States v. Freeman,* 514 F.2d 1314, 1320 (1975).

*Reversed and remanded for a new trial.*

MacKINNON, Circuit Judge, concurring:

I concur in the result of the majority opinion and generally in its analysis that the statement in the affidavit filed by the Government to support the search warrant is not hearsay under Rule 801(d)(2)(B) of the new Federal Rules of Evidence, and hence was admissible in appellant's defense.

However, in the course of the opinion there are several observations and statements, not necessary to the decision, which could be read as carrying meanings with which I disagree. First, the following is stated at page 934 of the opinion:

A search of the basement resulted in seizure of seventy-seven additional such pills and $30 cash, found in a shaving kit secreted in a hole in the ceiling, Tr. 17; $4,280 cash, found in a fuse box, Tr. 42; $410 cash, found in a dresser drawer, Tr. 15; the birth certificate of a Kelsey Eth-

eridge, found in an unidentified article of clothing on a chair, Tr. 265; and Etheridge's school identification, found on top of a television, Tr. 266. No fingerprints were taken from any of these particular items, Tr. 47–48, and no fingerprints at all were introduced at trial.

Later it is stated at page 936:

No fingerprints of his were found on any of the items concealed in the basement.

In many cases, the absence of fingerprint evidence is of no moment, as the situation involved may not involve circumstances where fingerprints would exist or otherwise would be salvageable. Reading over the list of "particular items" regarding which the opinion states "no fingerprints at all were introduced at trial" demonstrates that this is such a case. With one possible exception, none of the items listed are ordinarily conducive to the retention of fingerprints. This is true of the pills, cash, birth certificate of Etheridge, unidentified article of clothing, and the school identification of Etheridge. And Morgan's fingerprints on Etheridge's birth certificate and school identification would have had little or no significance. Thus, only the shaving kit might have made the Government's case stronger if it had been shown to have Morgan's fingerprints. There was, however, no showing in this record that the kit was composed of material that should be expected to acquire and retain evidence of fingerprints. The fact that no fingerprints were taken from any of these particular items or were introduced at trial is almost completely meaningless. *See United States v. Lee,* 166 U.S.App.D.C. 67, 71, 509 F.2d 400, 404 (1974), *cert. denied,* 420 U.S. 1006, 95 S.Ct. 1451, 43 L.Ed.2d 765 (1975).

The absence of fingerprints is one of those arguments that is frequently advanced when a guilty defendant cannot point to any real weakness in the prosecution's case. The theory it seeks to advance

16. We note that defense counsel never entered a formal "objection" or "exception" to the decision by the trial judge to exclude the informant's statements on relevancy and hearsay grounds. Nevertheless, counsel made amply clear to the trial judge the action which he desired the court to take. *See* note 5 *supra.* Under these circumstances no exception is necessary, Rule 51, Fed.R.Crim.P., and our analysis is controlled by the rule of harmless error, rather than the more stringent plain error doctrine. *See* Rule 52, *id.*

to the jury and appellate court is that the Government's case is weak because it did not produce some conclusive fingerprint evidence which is implicitly suggested, usually without any proof, as something that could have been obtained easily if the defendant had actually been involved and the officers not negligent. Not so. As here, most of the "items" that are so readily pointed to do not retain fingerprints; and with those articles that do, and which are actually directly connected with the offense, it must be remembered that those guilty of criminal offenses are very frequently careful not to leave fingerprints. Thus, the absence of fingerprints may really be an indication of the professionalism of the accused. Actually, a major criminal case in this district with significant fingerprint evidence is a rare exception. Yet, at infrequent intervals, we have a surfacing of claims that some significance should be given, in determining the guilt or innocence of an accused, to the fact that there was an *absence* of fingerprint testimony. The argument may be valid in rare instances, but this case is not one of them. Hence, I disassociate myself from whatever inference might exist from the statement in the opinion noting the absence of fingerprint testimony that the verdict was not reliable as a result of that absence. That the case might have been stronger with some unquestioned fingerprint testimony is self-evident, but its absence does not weaken the weight of the Government's case.

The opinion also makes several references to the circumstantial evidence that supports the verdict. I do not read these statements as inferring in any respect whatsoever that because proof of an offense in some respects is based on circumstantial evidence, there is something weak or deficient about the resultant verdict. That circumstantial evidence is frequently used in narcotics prosecutions is not startling. People who engage in these narcotics offenses do not draw pictures. They do not publicly advertise that they have narcotics for sale or maintain books and records of their criminal activities. Major elements of their offenses are most frequently proven by circumstantial evidence, which in many instances is more trustworthy and reliable than direct evidence, such as some eyewitness testimony, for instance. It is also the only method of proof of certain elements of numerous crimes. Circumstantial evidence is nothing more than a rational inference from certain facts—the application of common sense inferences from reliable evidentiary facts. There is no reason to denigrate the verdict here because the jury drew the rational inferences that were apparent from the face of the evidence.

At page 936, the opinion states that when "two or more people" have access to drugs so that "any one, or all of them might be criminally culpable . . . the threshold question . . . is . . . *Who* had possession?" I do not read this statement as conveying the impression that the inquiry in such cases must seek to determine which *particular individual* had sole possession; such a position would be erroneous. All that need be determined is whether the *accused* had possession. It is not necessary to determine that any single individual had *sole* possession—joint possession by two or more might suffice depending on the charge and joint possession in narcotics cases is very common. *United States v. Davis,* 183 U.S.App.D.C. 162, 562 F.2d 681 (1977).

I also do not read the statement at page 936 that "it is not clear whether the jury found that appellant intended to distribute the twelve pills . . . or the seventy-seven pills . . ." as carrying an inference that the amount appellant intended to distribute affected the reliability of the verdict. Actually, as between these two alternatives, it is immaterial whether he intended to distribute only the twelve pills, or only the seventy-seven pills, or both. The court charged the jury that a guilty verdict could be returned if they found that he knowingly and intentionally possessed with specific intent to distribute "some measureable amount of the controlled substance" (Tr. 296–97). The evidence of record indicated that either the pills seized from the floor in the hallway or those seized from

the ceiling in the basement were "measureable amounts" sufficient to support an inference that they were possessed "for distribution" (Tr. 110–11). Since the jury was properly charged and a verdict could rest properly on *either* quantity, or the total of all the pills, it is of no consequence that the record does not indicate which of the three alternatives was found by the jury.

I do not read these various statements in the opinion as containing these potential inferences of incorrect and immaterial content. Hence, I am able to concur in the result and the reasoning upon which the holding is based.