80 F.3d 558
 317 U.S.App.D.C. 82
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
UNITED STATES of America, Appellee
v.
Anthony CABRERRA, Appellant
 No. 95-3052.
 United States Court of Appeals, District of Columbia Circuit.
 Feb. 15, 1996.
 
 Before: EDWARDS, Chief Judge, WALD and HENDERSON, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This cause came to be heard on appeal from a judgment of the United States District Court for the District of Columbia, and it was briefed and argued by counsel. The issues have been accorded full consideration by the Court and occasion no need for a published opinion. See D.C.Cir.Rule 36(c). For the reasons stated in the accompanying Memorandum, it is
 
 
 2
 ORDERED and ADJUDGED, by the Court, that in No. 95-3052, the judgment of the United States District Court for the District of Columbia is affirmed.
 
 
 3
 The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely-filed petition for rehearing. See D.C.Cir.Rule 41(a).
 
 MEMORANDUM
 
 4
 Anthony Cabrerra appeals his conviction for possession with intent to distribute 50 or more grams of a substance containing cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii). Cabrerra contends that his due process rights were violated by the district court's refusal to admit evidence tending to show that the man sitting next to Cabrerra on the Amtrak train on which he was apprehended--a man identified only as "Dixon"--had a record of convictions for drug offenses. Cabrerra also contends that his due process rights were violated when a police officer was permitted to testify that Cabrerra had originally agreed to try on the jacket in which drugs were found (and which Cabrerra claimed belonged not to him, but to Dixon) but then declined to try it on after being informed that he would be photographed wearing it. We find that Cabrerra's rights were not violated by these district court rulings, and accordingly, we affirm his conviction.
 
 
 5
 On June 13, 1994, Metropolitan Police detectives boarded an Amtrak train arriving in Washington's Union Station from New York. Detective Hanson approached two men sitting next to each other. The man sitting next to the window, Cabrerra, produced identification, while the man on the aisle identified himself only as "Dixon." Neither man could produce a train ticket.
 
 
 6
 Each man consented to a search of his luggage and of his person, but no contraband was found. The detectives noticed a jacket lying across the tray table in front of Cabrerra's seat, and Detective Centrella testified that he asked Cabrerra if the jacket was his, and he said that it was. Cabrerra consented to a search of the jacket, and the police found in a pocket a plastic bag containing crack cocaine. After Cabrerra was handcuffed, he said "It's not my jacket." Detectives also found a train ticket on the floor of the train, in front of the seat Cabrerra had occupied. The ticket bore the name "Quirtaberro," and was issued for travel between New York and Rocky Mount, North Carolina. Cabrerra was taken off the train and read his Miranda rights. At the police station, Detective Mullis asked Cabrerra if he wanted to try on the jacket. Cabrerra agreed to do so, but when the detective told Cabrerra that he intended to take a photograph of him with the jacket on, Cabrerra declined to try on the jacket.
 
 
 7
 Cabrerra's defense at trial was that the jacket did not belong to him, but instead belonged to Dixon. He testified that he did not previously know Dixon, but that Dixon had told him that he was traveling to Rocky Mount, North Carolina. According to Cabrerra, he and Dixon had been eating in their seats on the train, and when they were through, Dixon collected his and Cabrerra's trash, and went down the aisle to throw it away. When Dixon returned to his seat, Cabrerra said, he took off his jacket and draped it across Cabrerra's tray table. Cabrerra testified that his own jacket was in his luggage and that his train ticket was in his knapsack (both pieces of luggage were left on the train by the police and were never recovered).
 
 
 8
 At trial, defense counsel showed Cabrerra two mugshots. One photo depicted a man named "Kevin Jackson"; the other depicted "Terry Roberts." In each case, Cabrerra identified the man in the photo as Dixon. Defense counsel sought to introduce the court jackets accompanying the mugshots, which allegedly showed that the man or men depicted in the photos had been convicted for possession and possession with intent to sell cocaine in North Carolina. The court refused to admit the court records--and thus the evidence of the prior convictions--finding that no adequate linkage had been made between the court records and the photos, and ruling that in any case the evidence would be confusing to the jury. The court also refused to exclude Detective Mullis' testimony about Cabrerra's refusal to try on the jacket.
 
 
 9
 "The district court has wide discretion to admit or exclude evidence where the question is one of relevancy or materiality." United States v. Morgan, 581 F.2d 933 (D.C.Cir.1978) (addressing exclusion of evidence suggesting third-party culpability). In this case, the district court appeared to be concerned both about the lack of an adequate foundation for the court records and the potential for confusing the jury. Defense counsel was denied a 24-hour continuance to bring a custodian from North Carolina in to court in order to provide the requisite foundation for admission of the court records. Because of defense counsel's offer, we rely in affirming Cabrerra's conviction exclusively on the evidence's slight probative value rather than any failure to lay a proper foundation.
 
 
 10
 Although cases concerning admission of evidence inculpating a third party are highly fact-dependent, the courts appear to consider primarily three factors in determining whether the evidence should be admitted: (1) whether the third party's guilt would establish the defendant's innocence; (2) the strength of the nexus between the third party and the crime; and (3) the relative strength of the evidence that the third party committed the crime compared with the evidence that the defendant committed the crime. See, e.g., United States v. Stewart, 770 F.2d 825 (9th Cir.1985) (not error to exclude evidence that co-defendant was distributing drugs where such evidence would not establish that defendant was himself innocent), cert.denied, 474 U.S. 1103 (1986); Guam v. Ignacio, 10 F.3d 608 (9th Cir.1993) (defendant in child sexual abuse case did not provide adequate nexus between child's mother's boyfriend and the crime); Glaze v. Redman, 986 F.2d 1192 (8th Cir.1993) (not error to exclude testimony that another individual had admitted to murder, where defendant had himself given multiple inculpatory statements).
 
 
 11
 Here, Cabrerra sought to use the criminal record of the man he identified as Dixon to bolster his claim that the incriminating jacket belonged to Dixon. Since the government had never charged Cabrerra with any sort of conspiracy or joint endeavor to distribute drugs with Dixon, assuming arguendo that Cabrerra could establish that the jacket was Dixon's, this fact, along with Dixon's undisputed proximity to the jacket during the train ride, might have gone a long way toward exonerating Cabrerra on the charge of possession with intent to distribute. Cf. Chambers v. Mississippi, 410 U.S. at 297 ("The state's proof at trial excluded the theory that more than one person participated in the shooting.... To the extent that [the third party's] sworn confession tended to incriminate him, it tended also to exculpate [defendant].").
 
 
 12
 It is also however true that the nexus between Dixon and the crime for which Cabrerra was on trial (as well as the North Carolina crimes) was provided only by Cabrerra's testimony, and was not independently corroborated. Cf. Chambers v. Mississippi, 410 U.S. 284 (1973) (third party had confessed to the murder in question); Pettijohn v. Hall, 599 F.2d 476 (1st Cir.) (eyewitness had initially identified third party as having committed the robbery), cert. denied, 444 U.S. 946 (1979). Conceivably, however, the jury could have credited Cabrerra's account that the jacket belonged to Dixon, thus establishing an adequate nexus between Dixon and the possession of the drugs.
 
 
 13
 On the other hand, the case against Cabrerra was quite substantial compared with the evidence of Dixon's culpability. The jacket in which the drugs were found was recovered from the tray table directly in front of Cabrerra, and Cabrerra, according to Detective Centrella, initially claimed the jacket was his (and at a minimum, did not disavow ownership of the jacket when the police asked his consent to search it). The situation is thus quite different from United States v. Morgan, where we reversed the district court's exclusion of evidence that a third party was engaged in the selling of drugs and had access to the particular drugs the defendant was charged with constructively possessing. We found in Morgan that there "was no evidence that appellant had actually sold phenmetrazine at any time." Id., 581 F.2d at 939. But unlike the situation presented in Morgan, the jury here did not have to "engage[ ] in speculative inferences to convict." Id. In sum, given the relatively weak nexus between Dixon and the crime for which Cabrerra was convicted and the relatively strong evidence against Cabrerra, it was not error for the district court to exclude evidence of past unrelated drug crimes by a person or persons only Cabrerra identified as his seatmate.
 
 
 14
 Additionally, we find no error in the district court's allowance of the testimony concerning Cabrerra's refusal to try on the jacket. See South Dakota v. Neville, 459 U.S. 553 (1983) (upholding introduction of evidence of defendant's failure to submit to blood alcohol test after he had been read his Miranda rights). On appeal, Cabrerra attempts to distinguish Neville, arguing that the defendant in Neville had been told that his refusal to take a blood alcohol test would carry adverse consequences, while Cabrerra was never told that his refusal to try on the jacket could be used against him. This difference, however, is not controlling. While the defendant in Neville had been informed that his driver's license could be suspended if he refused to take the test, he, like Cabrerra, was not informed that his refusal could be used against him at trial. In addition, contrary to Cabrerra's suggestion, we detect no element of coercion or deception in the police officer's request that Cabrerra try on the jacket and the officer's desire to make a photographic record of the event. Faced with an arrestee insisting that a jacket was not his, it seems perfectly reasonable for the police to offer Cabrerra a chance to show that the jacket did not fit. Just as in Neville, the police officer's action did not unfairly "trick" Cabrerra, even though Cabrerra was not warned that his refusal could be used against him. Thus the subsequent admission of testimony about that refusal did not violate Cabrerra's right against compelled self-incrimination.
 
 
 15
 For the foregoing reasons we affirm the conviction.